T.C. Memo. 2007-372

UNITED STATES TAX COURT

LINDA K. MINTON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6641-03.              Filed December 26, 2007.

P was a 50-percent shareholder in LPP, which had
claimed S corporation status since it elected that
status in 1975.  By 1986, P's father and founder of the
business had sharply reduced his participation in the
conduct of LPP's business affairs, which were then run
by P's brother and P.  In that year, P, her brother,
father, and mother (the directors and shareholders of
LPP) agreed that LPP would begin to make fixed, monthly
distributions to P's father.  Prior to filing her 1998
return, P was advised that that agreement had created a
second class of LPP stock, which negated LPP's S
corporation status in 1986 and for all subsequent
years.  See sec. 1361(b)(1)(D), I.R.C.  On that basis,
P failed to report on her 1998 return the LPP income
listed on the 1998 Schedule K-1, Shareholder's Share of
Income, Credits, Deductions, etc., issued to her by
LPP.  The issue for decision is whether the 1986
agreement caused LPP to lose its S corporation status.

<u>Held</u>:  P has failed to prove that the 1986
agreement constituted a "binding" agreement "relating
to distribution * * * proceeds" within the meaning of
sec. 1.1361-1(l)(2)(i), Income Tax Regs., and,
therefore, that that agreement created a second class

of stock, which caused LPP to lose its S corporation
status.


William A. Pesnell, for petitioner.

Daniel N. Price, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent has determined a deficiency of
$165,366 in petitioner's 1998 Federal income tax liability and an
addition to tax of $16,484 for that year on account of
petitioner's failure to file her 1998 return on time.  Petitioner
concedes the addition to tax and two of respondent's adjustments
resulting in his determination of a deficiency.  Putting aside a
computational adjustment that requires no decision by us, there
remain two issues for decision:  (1) Whether, before 1998, by
creating a second class of stock, Long's Preferred Products, Inc.
(LPP), lost its status as a pass-through entity (an S
corporation), thereby eliminating the requirement that petitioner
include her allocable share of LPP's 1998 income in her 1998
income, and (2) whether the duty of consistency bars petitioner
from asserting that LPP lost its S corporation status before
1998.  Because we decide the first issue in respondent's favor,
we need not (and do not) address the second issue.

Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for 1998, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

All dollar amounts have been rounded to the nearest dollar.

FINDINGS OF FACT[1]

Some facts have been stipulated and are so found.  The stipulation of facts, with attached exhibits, is incorporated by this reference.[2]

---

[1]  In part, Rule 151 provides as follows:

RULE 151. BRIEFS

* * * * * * *

(e) Form and Content: * * *

* * * * * * *

(3) * * * In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

Petitioner has filed an answering brief, but she has failed therein to set forth objections to the proposed findings of fact made by respondent.  Accordingly, we must conclude that petitioner has conceded respondent's proposed findings of fact as correct except to the extent that respondent has failed to direct us to any evidence in the record supporting those proposed findings or those findings are clearly inconsistent with either evidence in the record or petitioner's proposed findings of fact. See, e.g., Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

[2]  At trial, the Court reserved judgment with respect to respondent's objection to two, and petitioner's objection to one, of the exhibits (Exs. 17-P, 22-P, and 35-R) attached to the stipulation of facts.  Before the conclusion of the trial, the Court sustained respondent's objection (hearsay) to Ex. 17-P. The Court directed the parties to address on brief the admissibility of the two other exhibits.  Assuming arguendo that we were to resolve the two remaining disputes in petitioner's favor, we would nonetheless find for respondent in this case. Therefore, our findings of fact (and opinion) take into account petitioner's Ex. 22-P and exclude from consideration respondent's Ex. 35-R.

At the time the petition was filed, petitioner resided in Pineville, Louisiana.

Background

Petitioner's parents, Julian E. Long (Julian E.) and Alma Kathryn Long (Alma), both of whom are now deceased (Alma in 1990, Julian E. in 2005), operated LPP as a sole proprietorship in the early 1950s. Initially, no one else worked in the business. LPP sells janitorial and paper supplies.

LPP was incorporated under Louisiana law on December 31, 1975. From its inception through 1998, LPP had 100 shares of stock issued and outstanding. Pursuant to its articles of incorporation, those 100 shares constituted its total authorized capital stock.[3] Julian E. and Alma were the initial shareholders of LPP. Shortly after its incorporation, LPP filed an election with respondent to be treated as an S corporation. Respondent accepted that election.

In 1964, petitioner's brother, Julian W. Long (Julian W.), began working on a full-time basis for LPP as a janitor. He later worked as a delivery driver, a salesman, and, finally, a manager. In early 1985, he became president of LPP.

---

[3] The articles of incorporation do not specifically state that those 100 shares of stock (the 100 shares) represent a single class of stock with identical rights as to dividends or distributions. The articles, however, do not state the contrary. Also, petitioner's argument that the allegedly disproportionate distributions to Julian E. beginning in 1986 evidence the creation of a second class of stock indicates her belief that the 100 shares constituted a single class of stock prior to 1986. We think it a fair inference that the 100 shares constituted a single class, at least until then, and we so find.

In 1977, petitioner began working on a full-time basis for LPP. She worked in outside sales for approximately 7 years. Thereafter, until the early 1990s, she was involved in the management of LPP and was appointed vice president and secretary/treasurer on February 24, 1992.

Prior to 1977, Julian E. carried on the business of LPP. By the mid-1980s, however, he had ceased to be actively involved in day-to-day operations and, essentially, had became a consultant. LPP never paid him anything for his services that it labeled a salary. He did, however, draw money out of the corporation to pay his and his wife's living expenses as they needed it.

LPP's Distributions to Julian E. Long Beginning in 1986

During 1986, Julian E., Alma, Julian W., and petitioner agreed (the 1986 agreement) that, from then on, Julian E. and Alma would receive a monthly distribution from LPP, initially fixed at $4,000, but which amount fluctuated thereafter.

During 1993-95 (the last three full years in which Julian E. was a shareholder in LPP), with the exception of two $5,000 payments in 1995, one to Julian W. and one to petitioner, and one payment of $14,786 in 1995 on behalf of Julian W. for the purchase of a boat, the only distributions from LPP to its shareholders, other than in the form of payments (on their behalf) of income taxes to either the Internal Revenue Service or the Louisiana Department of Revenue, were made to Julian E. In each of 1993 and 1994, Julian E. received twelve $2,000 distributions. In 1995, he received eleven $2,000 distributions

and, like Julian W. and petitioner, one $5,000 distribution. Also, in 1993, LPP made four $522 payments to a bank on behalf of Julian E. In 1996, there were distributions to Julian E. in the form of tax payments on his behalf.[4]

For 1993-95, LPP's total distributions to shareholders closely approximated the 42-29-29-percent ownership interests of Julian E., Julian W., and petitioner, respectively, as reflected on LPP's 1993-95 returns as filed.[5]

Petitioner's 1998 and Amended 1996 and 1997 Returns and LPP's 1997 and 1998 Returns

During the course of litigation in the Louisiana State courts instituted by petitioner against LPP, Julian E., Julian W., and others with respect to the number of LPP shares owned by

---

[4] The record contains no evidence as to the actual amounts of the monthly payments to Julian E. from 1986 to 1992, and only petitioner's testimony that they, in fact, were made.

[5] We make no findings of fact regarding ownership of the 100 shares between 1990, after Alma died, and 1996 when Julian W. and petitioner each became the owner of 50 of the 100 shares. In 2001, LPP's accountant represented to respondent that LPP's 1986-95 returns show that Julian E. held 42 percent of its shares and Julian W. and petitioner, 29 percent each, and that, effective January 1996, Julian E. conveyed all of his LPP shares to Julian W. and petitioner, one-half to each. That representation is corroborated by trial testimony given in an earlier Louisiana State court proceeding by LPP's prior accountant. There is, however, contradictory evidence in the record indicating that (1) at the time of her death in 1990, Alma owned a one-half community interest with Julian E. in 42 shares of LPP stock, (2) she bequeathed the shares represented by that interest (21 shares) to Julian W. and petitioner, 10.5 shares to each, thereby giving each 39.5 shares or a 39.5-percent interest in LPP as of 1990, and (3) in 1996, Julian E. transferred 21 shares to his children, not 42 shares.

her (the first Louisiana litigation),[6] petitioner discovered an audio tape of a purported 1986 LPP shareholders/directors meeting attended by Julian E., Julian W., and Alma.  Her attorney, who is also her counsel in this case, after listening to the tape and having it transcribed, advised her that the participants at the meeting, by providing for a fixed level of distributions to Julian E., had created a second class of stock in LPP, thereby negating LPP's S corporation status.  Consistent with that position, petitioner, on her 1998 Form 1040, U.S. Individual Income Tax Return, which she filed on or about November 15, 1999, omitted $229,292 of ordinary income and other pass-through items reported on the Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., issued by LPP to her for 1998.[7]  Along with her 1998 return, petitioner submitted a Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR), which purported to justify that omission on the basis that the 1986 agreement created a second class of stock in LPP,

---

[6]  In an unpublished opinion, Minton v. Long's Preferred Prods., Inc., 829 So. 2d 669 (La. Ct. App. 2002), the court of appeal held in petitioner's favor in that litigation and confirmed that she (1) purchased 19 shares of LPP stock in 1986 and (2) owned 50 shares (or 50 percent) of that stock as of 1996, not 40.5 shares (or 40.5 percent) as had been alleged by Julian E. and Julian W. and reported on the 1998 Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., issued to her by LPP.

[7]  Respondent's adjustment for petitioner's alleged omission of LPP income is $283,077, based upon her ownership of 50 shares of LPP stock, whereas the 1998 Schedule K-1 issued to her by LPP reflects her ownership of only 40.5 shares, a position that was subsequently rejected by the Louisiana Court of Appeal.  See supra note 6.

thereby causing it to lose its S corporation status in 1986. Thereafter, petitioner filed amended 1996 and 1997 returns in which she took a position, vis-a-vis LPP's earnings, consistent with that taken in her 1998 return.

LPP's 1997 Form 1120S, U.S. Income Tax Return for an S Corporation, reports $160,562 of ordinary income from trade or business activities, total distributions to shareholders of $91,460, retained earnings at the start of the year of $582,933, and yearend retained earnings of $649,035.  LPP's 1998 Form 1120S reports $566,153 of ordinary income from trade or business activities, total distributions to shareholders of $32,946, and yearend retained earnings of $1,182,242.  The 1998 Schedule K-1 issued to Julian W. and petitioner do not list any amount as having been distributed to them.[8]

LPP filed Forms 1120S for tax years 1976-98.  Except for her amended 1996 and 1997 Federal returns, for all tax years prior to 1998 during which she was a shareholder in LPP, petitioner included in income all LPP pass-through items in conformance with the Schedule K-1 issued to her by LPP.

Petitioner's 1999 Transfer of One Share of LPP

On June 7, 1999, petitioner contributed one share of her LPP stock to H.C. Chemicals, Inc. (HCC), which had been incorporated by her daughter, Heather Minton Fuller (Heather), on June 4, 1999.  Heather became the president and sole shareholder of HCC,

---

[8]  LPP's financial records for 1998, however, do reflect 1998 distributions to Julian W. and petitioner in the sum of $32,946.

the sole function of which has been to hold shares of LPP. LPP utilized June 7, 1999, as the date of termination of its S corporation status.

Louisiana Court of Appeal Decision

The first Louisiana litigation ended with an unpublished opinion by the Louisiana Court of Appeal,[9] affirming the decision of the Louisiana (Rapides Parish) District Court that petitioner did, in fact, purchase 19 shares of LPP stock from Julian E. in 1986. The Court of Appeal stated:

> Linda could not remember what each document was entitled nor the terms of the [1986] sale [of 19 shares of LPP stock to her and 19 shares to Julian W.], other than to say that the consideration for the sale would come in the form of payments to Julian E. from the corporation.

Petitioner's October 2, 2000, Affidavit

In connection with the first Louisiana litigation, petitioner executed an affidavit in which she made the following representations:

> On September 23, 1986, Julian Edward Long sold 38 shares of stock, in equal amounts, to affiant and Julian W. Long. They signed an Act of Sale, promissory notes and stock certificates to this effect.
>
> * * * * * * *
>
> Thereafter, consideration for the sale of the stock was paid to Julian Edward Long monthly out of the profits of the corporation in the form of cash, house payments, car payments, payments on all monthly expenses and credit card bills, and other payments. * * *

---

[9] Minton v. Long's Preferred Prods., Inc., supra.

Petitioner's April 21, 2004, Deposition

In connection with additional litigation in the Louisiana courts, this time in a suit to rescind the 1986 sale of LPP stock by Julian E. to petitioner (together with the first Louisiana litigation, the Louisiana litigation), petitioner was deposed on April 21, 2004, by plaintiffs' counsel.  During the deposition, petitioner testified that she executed a promissory note to Julian E. in consideration for 19 shares of LPP stock.  In testifying as to the manner in which she made payments on that note, the following exchanges occurred between petitioner and plaintiffs' counsel:

> A [Petitioner]:    Okay, the payments to my father were made on my behalf through Long's Preferred Products.
>
> Q [Counsel]:    In other words, you are saying that the corporation paid your note, is that correct, that was owed to your father?
>
> A [Petitioner]:    He -- the stock that I purchased from my father was paid on my behalf through the corporation, and that was the way that my father and my brother and myself talked about having it done.
>
> *   *   *   *   *   *   *
>
> Q [Counsel]:    So you, as of this date -- have you, yourself, personally, made any payment towards the retirement of this note?
>
> A [Petitioner]:    I have through the corporation of Long's Preferred Products.
>
> *   *   *   *   *   *   *

Q [Counsel]:           If Long's Preferred Products did
                       not make any payments on your
                       behalf, who else would have made
                       the payments?

A [Petitioner]:        Mr. Lee, I know Long's Preferred
                       Products did.  I know I was
                       working.  I know I had the meeting
                       with my father and my brother.  I
                       know what took place.  I know he
                       was not working.  I know I was not
                       -- I mean, I was working, and I
                       know he was happy with the
                       arrangement.  So I don't know what
                       the books would reflect, but I know
                       what took place.

Q [Counsel]:           When did this meeting take place?

A [Petitioner]:        It would have been in 1986.

OPINION

## I.  Introduction

We must determine whether, on account of a second class of stock, LPP's status as an S corporation terminated in 1986.  If it did, then petitioner did not have to include in her 1998 income her allocable share of LPP's 1998 income except to the extent distributed to her.  Petitioner concedes that she bears the burden of proof.  See Rule 142(a).

## II.  Discussion

### A.  Internal Revenue Code and Regulations

With respect to any taxable year, section 1361(a)(1) defines an S corporation as "a small business corporation for which an election * * * [to be an S corporation] is in effect for such year."  Section 1361(b) defines a "small business corporation" as a domestic corporation which must satisfy a number of requirements, one of which is that it not have "more than 1 class

of stock." See sec. 1361(b)(1)(D).

In pertinent part, and with exceptions not here relevant, section 1.1361-1(l)(1), Income Tax Regs., provides that "a corporation is treated as having only one class of stock if all outstanding shares of stock of the corporation confer identical rights to distribution and liquidation proceeds." In pertinent part, section 1.1361-1(l)(2)(i), Income Tax Regs., provides:

> The determination of whether all outstanding shares of stock confer identical rights to distribution and liquidation proceeds is made based on the corporate charter, articles of incorporation, bylaws, applicable state law, and binding agreements relating to distribution and liquidation proceeds (collectively, the governing provisions).

Pursuant to section 1362(d)(2), S corporation status terminates when the corporation ceases to qualify as an S corporation, e.g., upon the creation of a second class of stock.

B. Analysis

1. Absence of a Binding Agreement

Petitioner argues that (1) the 1986 agreement constituted a "binding agreement", within the meaning of section 1.1361-1(l)(2)(i), Income Tax Regs.,[10] to make "guaranteed payments" to

---

[10] We note that, pursuant to sec. 1.1361-1(l)(7), Income Tax Regs., "sec. 1.1361-1(l) does not apply to: an * * * arrangement * * * entered into before May 28, 1992, and not materially modified after that date". Sec. 1.1361-1(l)(7), Income Tax Regs., continues, however: "a corporation and its shareholders may apply this sec. 1.1361-1(l) to prior taxable years." We consider petitioner's 1998 return position and her reliance upon sec. 1.1361-1(l)(1) and (2)(i), Income Tax Regs., in this case as an election by petitioner, in her capacity as a shareholder of LPP, to apply sec. 1.1361-1(l), Income Tax Regs., to the 1986 agreement. Therefore, we shall apply that regulation
(continued...)

Julian E., beginning in 1986, in whatever monthly amounts would be necessary to cover his and Alma's living expenses, (2) those payments "were made over time, and accounted for properly as state law dividends", and (3) because "[n]o other shareholder received the monthly guaranteed payments that were received by Julian E. Long", LPP ceased to be an S corporation "from the moment that the agreement was made".

We find that the evidence does not support petitioner's position. She has failed to carry her burden of proving that the 1986 agreement constituted a "binding agreement" giving Julian E. enhanced or disproportionate "rights to [LPP's] distribution and liquidation proceeds", as required by section 1.1361-1(l)(1) and (2)(i), Income Tax Regs. Such an agreement is necessary in order for us to conclude that LPP had a second class of stock.

To begin with, petitioner has failed to establish that the 1986 agreement was in any way "binding". At best, petitioner testified that that agreement was nothing more than an informal, oral understanding among the board members/shareholders of LPP to have LPP make monthly distributions to Julian E. in whatever amounts he (and Alma) needed to cover their living expenses, a practice similar to that which prevailed prior to 1986. There is no evidence that the family members, in their capacity as directors and/or shareholders of LPP, took any formal corporate

---

[10](...continued)
in deciding whether the 1986 agreement created a second class of LPP stock.

action to implement that understanding.[11]

Louisiana corporation law specifically addresses the manner in which directors or shareholders of a Louisiana corporation shall act on behalf of the corporation. Petitioner has cited no provisions of Louisiana corporation law (and, therefore, no authority) in support of her position that LPP was bound by the 1986 agreement with the result that it might be said to constitute a "binding agreement" for purposes of section 1.1361-1(l)(2)(i), Income Tax Regs. Our own review of Louisiana corporation law leads us to conclude that the procedures required to (1) institute a board of directors' or shareholders' meeting and (2) adopt binding resolutions at such meetings are either governed by the articles of incorporation and/or the bylaws or by the Louisiana corporation law itself.[12]

---

[11] That absence of corporate action is inconsistent with what appears to have been the normal practice of LPP's shareholders/directors to keep written minutes of directors' and shareholders' meetings and of resolutions adopted at those meetings.

[12] With regard to board of directors' meetings, see La. Rev. Stat. Ann. sec. 12:81C(6)(a) (1994):

[N]otice of meetings of the board shall be given as provided in the articles or bylaws. If not so provided:

(i) Regular meetings of the board may be held without notice of the date, time, place, or purpose of the meeting, provided that the date, time, and place are fixed by the board or are determinable pursuant to the articles or bylaws.

(ii) Special meetings of the board shall be preceded by at least two days notice of the date, time, and place of the meeting.

(continued...)

LPP's articles of incorporation do not address the procedures for (1) instituting directors' or shareholders' meetings or (2) adopting binding resolutions at such meetings, and petitioner has failed to place LPP's bylaws into evidence. Nor has she demonstrated compliance with the provisions of Louisiana corporation law that pertain to those procedures in the absence of controlling articles or bylaws.

Without evidence that the 1986 agreement constituted a "binding agreement" within the meaning of section 1.1361-1(l)(2)(i), Income Tax Regs., the most that can be said of the monthly distributions to Julian E. is that they, in effect, provided him with a timing benefit vis-a-vis LPP's distributable earnings, which, in total, have not been shown to belong to LPP's

---

[12](...continued)
    (iii)  The notice of a special meeting of the board shall describe the purpose of the special meeting.

See also La. Rev. Stat. Ann. sec. 12:81C(9) (1994):

    Any action which may be taken at a meeting of the board of directors * * * may be taken by a consent in writing signed by all of the directors * * * and filed with the records of proceedings of the board * * * .

With regard to shareholders' meetings, see La. Rev. Stat. Ann. sec. 12:73D (1994), which, in pertinent part, provides:

    Unless otherwise provided in the articles or by-laws, and except as otherwise provided in this Chapter, the authorized person or persons calling a shareholders' meeting shall cause written notice of the time, place and purpose of the meeting to be given to all shareholders entitled to vote at such meeting, at least ten days and not more than sixty days prior to the day fixed for the meeting.  * * *  Notice of any shareholders' meeting may be waived in writing by any shareholder at any time  * * *

shareholders on other than a pro rata basis (in accordance with their respective stock ownership percentages).  See sec. 1.1361-1(l)(2)(vi), Example (2), Income Tax Regs. (indicating that differences in the timing of distributions to shareholders do not cause an S corporation to be treated as having more than one class of stock).[13]

> 2. Purpose and Nature of the Fixed Distributions to Julian E.

The only support for petitioner's argument that, in 1986, the directors/shareholders of LPP agreed to make fixed distributions to Julian E. in amounts necessary to cover his (and Alma's) living expenses is petitioner's testimony to that effect. But that testimony is contradicted by the Louisiana Court of Appeal's description of petitioner's trial testimony and by petitioner's affidavit and a deposition given in connection with the Louisiana litigation, all of which indicate that all or a portion of the fixed distributions to Julian E., commencing in 1986, were made for the purpose of paying him (through LPP) for his 1986 sale of LPP stock to Julian W. and petitioner.  If that is so, it follows that some or all of the distributions to Julian

---

[13] In this connection, we note the absence of evidence that any disproportionate distributions to Julian E. prior to 1996, when he ceased to be a shareholder in LPP, would not be offset by future remedial distributions to the other shareholders out of LPP's substantial retained earnings, which totaled $582,933 at the end of 1996.  Moreover, the payment of $14,786 in 1995 on behalf of Julian W. for the purchase of a boat indicates that remedial payments could occur whenever Julian W. or petitioner needed distributions in excess of LPP's tax payments on their behalf.  That payment also indicates that all of the shareholders were on equal footing vis-a-vis profit distributions from LPP in that all were entitled to distributions on an as-needed basis.

E. were from LPP profits that belonged, and were taxable, to Julian W. and petitioner, not to Julian E.  See, e.g., <u>Bitker v. Commissioner</u>, T.C. Memo. 2003-209 (partnership's payments of interest on the taxpayer-partner's personal debt included in his taxable distributions from the partnership).  Thus, assuming arguendo that the 1986 agreement represented a binding agreement on the part of LPP's directors/shareholders to make disproportionate distributions to Julian E., petitioner has failed to establish that the payments did, in fact, constitute distributions with respect to Julian E.'s shares rather than distributions in discharge of Julian W.'s and petitioner's personal debts to Julian E. and, therefore, distributions with respect to <u>their</u> shares.  Moreover, the conflicting evidence regarding the purpose of the fixed distributions to Julian E. raises the possibility that they were intended to achieve both of those purposes and, therefore, that they were made, in part, with respect to Julian E.'s shares and, in part, with respect to Julian W.'s and petitioner's shares.  In that event, they very well may have constituted proportionate distributions, a result fully consistent with the continued existence of one class of LPP stock.

### 3. Conclusion

Petitioner has failed to prove that LPP had more than one class of stock in 1998.

## III. Conclusion

In light of petitioner's concessions and our disposition of

the more than one class of stock issue, we must sustain
respondent's determination of a deficiency.

<u>Decision will be entered
for respondent</u>.