# United States Tax Court

T.C. Memo. 2024-77

JAMES J. MAGGARD AND SZU-YI CHANG,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 3965-20.                           Filed August 7, 2024.

————————

James J. Maggard and Szu-Yi Chang, pro sese.

*D. Anthony Abernathy* and *Trent D. Usitalo*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, *Judge*: James Maggard is an entrepreneur who cofounded an engineering firm. When his original partner left, Maggard took on two friends as coowners. They proceeded to loot the firm or, as one says in taxspeak, made unauthorized distributions to themselves in excess of their proportionate ownership shares. Maggard says these actions effectively terminated the firm's status as an S corporation under the Code. The Commissioner disagrees and wants Maggard and his wife to pay tax on income that they never received, as owners of S corporations must sometimes do.

**[\*2]**                                  FINDINGS OF FACT

I.      *Origins of Schricker*

Maggard lives in the Silicon Valley community of Saratoga with his wife, Szu-Yi Chang.[1]  He is one of the area's innovators and inventors, and his special talent is chemical engineering—particularly the technical aspects of designing manufacturing facilities and structures.

He used that knowledge to cofound Schricker Engineering Group, an engineering consulting partnership.  His friend and business partner was Todd Schricker.  With their complementary skill sets, Maggard and Schricker consulted on mechanical, electrical, and structural engineering matters for commercial and industrial clients alike.

Business was good enough that two years later, in 2002, the men incorporated Schricker in California.  They also elected for Schricker to be treated as an S corporation when filing the company's 2002 federal tax return.[2]  Schricker never changed this election in 2014–16, the years at issue.

There were 10,000 shares of Schricker stock.  Maggard and Schricker each owned half, and the shares were denoted as "common shares."  Under California law, this entitled each owner to a *pro rata* share of any dividends as well as any distribution of its assets on liquidation.  Cal. Corp. Code §§ 159, 400(b) (West 1975).

The number of shares, the number of share classes, the share classification, and the percentage of ownership were all plainly set out in Schricker's original corporate documents.  These corporate documents include Schricker's articles of incorporation and its bylaws.

Here's what the articles of incorporation say about the company's stock:

---

[1] This means appellate venue presumptively lies in the Ninth Circuit.  *See* § 7482(b)(1)(A).  (All section references are to the Internal Revenue Code and regulations in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.)

[2] An S corporation is a small business corporation whose shareholders make an election under section 1362(a).  S corporations get their name because they are taxed under subchapter S of the Code.  *Maines v. Commissioner*, 144 T.C. 123, 125 n.3 (2015); § 1366(a)(1).

**[*3]** The total number of shares which the corporation is authorized to issue is 10,000, all of which are of one class and of a par value of $.00 each, and all of which are Common shares.

That's all the corporate documents say. Schricker has bylaws, but they do not mention more than one class of stock or make any allowance for disproportionate liquidation rights to its shareholders.

In July 2003, Todd Schricker sold his interest in the company to Maggard and left. Maggard then sold a 60 percent interest in Schricker to two individuals, LL and WJ.[3]

II. *The New Regime*

LL and WJ joined Schricker's board and took on executive roles of their own. Maggard was the company's lead engineer, though he also helped in sales and business development.

LL brought with him an accounting background. He handled Schricker's accounting and books, and Maggard trusted him to do so because he was an old family friend. LL served as Schricker's CEO and CFO during the years at issue.

WJ was Schricker's new corporate secretary. Both LL and WJ oversaw the company's day-to-day operations. All three served on the board of directors.

By 2005, Maggard owned 40 percent of the company.[4] LL also owned 40 percent, while WJ owned the remaining 20 percent. Per the company's governing documents, each was entitled to a proportionate share of Schricker's distributions. The three men never changed Schricker's articles of incorporation or its bylaws to allow for

---

[3] We identify these men by their initials because Maggard's allegations of their misconduct could seriously harm their reputations if believed, and the truth of his allegations turns out not to be important in ruling on his tax issue.

[4] The parties' first stipulation of facts lists the trio as holding 2,000 shares among them in 2005 and 10,000 total in 2016. Nothing in the record indicates how Schricker went from having 10,000 shares upon incorporation, down to 2,000 in 2005, and back to 10,000 by 2016. On the contrary, the articles of incorporation and Schricker's copy of stock certificates dated May 11, 2016, each sum to 10,000 shares.

In any event, the record shows Maggard, LL, and WJ retained the same proportions of stock in Schricker during this period. The number of shares has no bearing on the *rights* that ownership of those shares gave Maggard, LL, and WJ.

[*4] disproportionate distributions or liquidation rights under this new regime.

What they did change was the good working environment that Maggard had enjoyed with Todd Schricker. LL almost immediately began to misappropriate funds by inflating reimbursements for his expense accounts. He and WJ also began a process of making disproportionate distributions of Schricker's earnings to themselves at the expense of Maggard.

That wasn't LL's only misdeed. Even though they don't pay taxes, S corporations are required to file information returns to report their income and deductions to their owners. *See* § 6037. LL stopped filing these Forms 1120S, U.S. Income Tax Return for an S Corporation, as soon as he became CFO. He also stopped sending Schedules K–1, Shareholder's Share of Income, Deductions, Credits, etc., to Maggard.[5]

By 2012 Maggard had caught on to LL and WJ. He hired a CPA and asked him to reconcile Schricker's accounts. They discovered that LL overdistributed $160,800 from Schricker to himself.

They also discovered that LL failed to distribute nearly $165,000 of Schricker's profits to Maggard, to whom it was owed. Maggard eventually accused LL and WJ of embezzling more than $1 million from Schricker. This included an estimated $250,000 in 2012 and $300,000 in each of 2013, 2014, and 2015.

III.  *State Court Litigation and Settlement*

When Maggard confronted him in 2012 about these unauthorized distributions, LL denied any wrongdoing. From this point on, however, LL and WJ froze out Maggard. They cut him off from the company's books, cut him out of meetings, and altogether made his position untenable. This prevented Maggard from fully participating as a director and shareholder of Schricker, as was his right.

Using their majority positions on the board, LL and WJ also voted to increase their salaries, vacation time, and other benefits as employees. They authorized payouts to themselves based on retroactively increasing the amount of paid time off they had

---

[5] A Schedule K–1 is a form the IRS requires a firm to send to its owners so they can report their share of the firm's income and losses. 33 Am. Jur. 2d Federal Taxation § 2589, Westlaw (database updated May 2024).

[*5] accumulated going back to 2003. These payouts were worth $325,000 by 2016. Maggard received no such benefits.

LL and WJ then sued Maggard in California Superior Court. Their claims included breach of contract and fraud. They also sought injunctive relief in the form of specific performance of Maggard's employment contract, as well as declaratory relief to assert LL's and WJ's combined 60 percent ownership of Schricker.

Maggard filed a countersuit in 2013. He asked for rescission based on fraud and failure of consideration, conversion, breach of contract, and embezzlement. He also sought declaratory relief to invalidate LL's shares, as well as an accounting of Schricker's books.

The court filed its proposed judgment in August 2016.[6] It found that Schricker had overdistributed to LL and underdistributed to Maggard. Schricker had not distributed any of the company's profits to Maggard during the course of litigation, although cash continued to flow to LL and WJ.

The court also found that Maggard had not authorized Schricker's disproportionate distributions to LL and WJ. Maggard wasn't aware of any formal board or shareholder agreements which authorized disproportionate distributions. The judgment therefore included an order to Schricker to make a corrective distribution of $164,783 to Maggard.

LL and WJ refused to pay. Instead, LL offered to buy Maggard's entire stake in the company for $1,262,500. Maggard agreed. He signed the settlement in October 2018.

The settlement agreement included a covenant that Schricker wouldn't make any changes to the K–1s it finally issued to Maggard in 2018 for the 2012–17 tax years. From this point on, Maggard had no role—official or otherwise—in the company that he had cofounded.

IV. *Whistleblower Attempt*

In addition to litigating in state court, Maggard contacted the Commissioner's Whistleblower Office. He spoke with a customer service representative to explain that Schricker had made disproportionate

---

[6] The proposed judgment technically ruled on the second phase of a bifurcated trial and followed a tentative statement of decision that was also in Maggard's favor.

**[\*6]** distributions and failed to issue a K–1 for 2011. He also reported that LL used company funds to pay for a portion of his litigation expenses against Maggard.

The representative told Maggard that he needed to use the IRS's official whistleblower form, Form 3949–A, Information Return, to submit a whistleblower claim. Doing so, Maggard was told, might cause the termination of Schricker's S corporation status. Schricker would then be taxed as a C corporation and, presumably, owe corporate taxes to which it was not previously subject. But it might also mean that Maggard wouldn't have to include in his own taxable income money that he was entitled to, but had not received, from the firm.

Maggard completed and submitted the whistleblower form to the Commissioner after the California court issued its tentative decision.[7] On the form, Maggard alleged Schricker claimed false deductions, underreported income, failed to pay tax, and provided kickbacks to LL and WJ. The IRS received the whistleblower form but didn't act on the information.

The issue of whether Maggard is entitled to an award for his claim under section 7623(b) isn't before us, but the suggestion planted by the Whistleblower Office—that unequal distributions might terminate Schricker's status as an S corporation—most definitely is.

V.     *Tax Preparation and Trial*

    A.     *Napkin Accounting*

During his boardroom tribulations, Maggard took on the task of compiling and filing his and his wife's tax returns without the assistance of an accountant. And he did so without much help from Schricker. The firm filed its own Forms 1120S for the years at issue—indeed, for all the tax years 2011–16—only in April 2018. Maggard knew he had to file his own income-tax return, and knew he had to include his share of Schricker's income and expenses on it. To try to get this done, he had his attorney contact LL to get these numbers.

LL came back with a single number written on a napkin: $300,000. This purportedly represented Maggard's *pro rata* portion of Schricker's losses for tax year 2014. Maggard and his wife filed their

---

[7] Maggard also submitted a fraud referral report to the California Franchise Tax Board.

**[\*7]** 2014 return on August 16, 2016, and claimed this $300,000 loss on Schedule E, Supplemental Income and Loss.[8]

Maggard did the same for tax year 2015. He again got a single number he was told was the loss he could claim. Maggard and Chang filed their 2015 Form 1040 in July 2017, and on it claimed a $50,000 loss from Schricker.

Maggard and Chang filed their 2016 return in November 2018,[9] but reported no income or loss from Schricker. Schricker also finally issued the Schedules K–1 to Maggard and its other shareholders for the 2011–16 tax years around this time. The Commissioner received them as well. Maggard's K–1s showed his proportionate share of Schricker's earnings and they showed profits, not losses.

B.  *The Notice of Deficiency*

Napkin accounting is bound to attract the Commissioner's attention, and the IRS audited Maggard and Chang's returns. It determined that Maggard and Chang didn't correctly report income or losses from Schricker. The Commissioner also determined that the couple's income from Schricker during those years was passive because Maggard hadn't been actively participating in the business.

We summarize:

|  | *Income as determined from Schricker* | *Disallowed Schedule E losses as reported* | *Allowed expenses from Schricker per K–1* |
| --- | --- | --- | --- |
| 2014 | $18,376 | ($300,000) | ($15,624) |
| 2015 | 324,317 | (50,000) | (41,025) |
| 2016 | 159,568 | 0 | (11,528) |

We are left to decide whether Schricker lost its S corporation status and, if so, what adjustments should be made to Maggard and Chang's income.

---

[8] Maggard and Chang now concede that they didn't incur this loss.

[9] The Commissioner determined additions to tax under section 6651(a)(1) for 2015 and 2016, but later conceded that Maggard and Chang aren't liable for these additions.

**[\*8]**                                    OPINION

I.      *S Corporation Requirements*

This case turns on the Code's rules for S corporations.  The first rule is that shareholders have to *choose* to be taxed as an S corporation. Shareholders like Maggard do so by filling out a Form 2553, Election by a Small Business Corporation, that they file with the IRS.  *See* Treas. Reg. § 1.1362-6(a)(2)(i).  Once the IRS approves, the election remains effective indefinitely.  § 1362(c); *see Mourad v. Commissioner*, 121 T.C. 1, 4 (2003), *aff'd*, 387 F.3d 27 (1st Cir. 2004).

A great many small and medium-sized businesses elect S corporation status because the Code affords them special treatment— income earned by the corporation escapes corporate-level taxation. *Mourad*, 121 T.C. at 3; *see* §§ 1363, 1366.  That income is instead "passed through" to its shareholders *pro rata*.  *See* §§ 1363, 1366.

But electing to be an S corporation is not enough.  The Code has several other requirements.  These include having no more than 100 shareholders, having only shareholders who are individuals—or certain trusts or nonprofits—and not having any nonresident alien shareholders.  § 1361(b)(1).  The parties don't dispute that Schricker met these requirements.

There's one other requirement, however, that is very much in dispute here.  Section 1361(b)(1)(D) allows a corporation to be an S corporation only if it has no more than one class of stock.  What does that mean?  Section 1361 doesn't say, but we know that run-of-the-mill debt isn't a second class of stock.  § 1361(c)(5)(A).  And neither are differences in common-stock voting rights.  § 1361(c)(4).

The regulation gives us a little more help.  It generally treats a corporation as having only one class of stock so long as all the shares confer equal rights to dividends and liquidation proceeds.  Treas. Reg. § 1.1361-1(l)(1) ("[A] corporation is treated as having only one class of stock if all outstanding shares of stock of the corporation confer identical rights to distribution and liquidation proceeds").

The regulation also tells us to determine whether stock confers identical rights to distributions and liquidation proceeds based on the corporation's governing provisions.  *Id.* subpara. (2)(i).  These are documents like a corporate charter, articles of incorporation, and bylaws.  *Id.*  The IRS has said it won't treat any disproportionate

[*9] distributions made by a corporation as violating the one-class-of-stock requirement if the governing provisions provide for identical rights. Rev. Proc. 2022-19, § 3.02, 2022-41 I.R.B. 282, 286.

Here is where the parties diverge. Maggard argues that his new partners in Schricker were looting the company when they made unauthorized and grossly unequal distributions to themselves. The Commissioner says that doesn't matter, because the regulation tells the IRS to focus on shareholder *rights* under a corporation's governing documents, not what shareholders actually *do*. On this point, we have to side with the Commissioner. The regulation plainly states that uneven distributions don't mean that the corporation has more than one class of stock. Treas. Reg. § 1.1361-1(l)(2) ("[A] corporation is not treated as having more than one class of stock so long as the governing provisions provide for identical distribution and liquidation rights . . . .").

We recognize that this can create a serious problem for a taxpayer who winds up on the hook for taxes owed on an S corporation's income without actually receiving his just share of its distributions. This is especially problematic when the taxpayer relies on the S corporation distributions to pay these taxes. Worse yet is when a shareholder fails to receive information from the corporation that he needs to accurately report his income.

This is what happened to Maggard.

II.    *Disproportionate Distributions*

One cannot help but sympathize with a taxpayer caught in this situation. But it is a situation that we've seen before. In *Minton v. Commissioner*, 94 T.C.M. (CCH) 606, 607 (2007), *aff'd*, 562 F.3d 730 (5th Cir. 2009), a shareholder of a family-owned janitorial and paper-supply company drew out distributions rather than a salary to pay his expenses on an as-needed basis. A later oral agreement between three other family shareholders provided them fixed distributions from the company to the exclusion of the taxpayer. *Id.*

We held that the absence of a binding agreement between the S corporation's shareholders didn't give disproportionate distribution *rights* to shareholders who in fact got unequal distributions. *Id.* at 609. We also said that such an agreement was necessary under Treasury Regulation § 1.1361-1(l)(2) to disqualify the company from remaining an S corporation. *Minton*, 94 T.C.M (CCH) at 607. Furthermore, the purpose and nature of at least some of the distributions were a discharge

**[*10]** of personal debts from one family shareholder to another. *Id.* at 610. These draws were therefore distributions with regard to these shareholders' shares, not the petitioning taxpayer's.

We relied on *Minton* in *Mowry v. Commissioner*, 116 T.C.M. (CCH) 55 (2008), where the taxpayer and his brother incorporated a rebar company as an S corporation. *Id.* at 55–56. The taxpayer later discovered that his brother had taken substantial withdrawals from the corporation's accounts without his knowledge or authorization. *Id.* at 56. The company failed to file Forms 1120S and issue Schedules K–1 for the years at issue, and as a result the Commissioner determined that 49 percent of the corporation's net income was the taxpayer's even though he'd received nowhere near that amount in distributions. *Id.* at 56–57.

The taxpayer argued that his brother's withdrawals effectively changed the company's articles of incorporation and bylaws by majority action. *Id.* at 58. But he could not point to a change in the articles or bylaws that redefined shareholders' rights or authorized a new class of stock. *Id.* at 58–59. We held against him. *Id.* (citing *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), *aff'g* 34 T.C. 235 (1960)).

The regulation's language and this caselaw force us to hold that disproportionate distributions by themselves do not change a company's S corporation status. The unauthorized distributions in this case were hidden from Maggard, but they were certainly not memorialized by WJ and LL by formal amendments to Schricker's governing documents. Without that formal memorialization there was no formal change to Schricker's having only one class of stock. And this means that we cannot revoke Schricker's election to be an S corporation for disproportionate distributions under Treasury Regulation § 1.1361-1(l)(2).

Maggard tries to distinguish his circumstances from those in *Mowry* and *Minton*. He says that his case is about more than just disproportionate distributions—that it's also about deferred income, removal of shareholder and board member rights, and lack of sufficient information. Surely, he says, all of this warrants the removal of Schricker's S corporation status, so that he doesn't get taxed on income he didn't receive and didn't for some time even know about.

The law is ironclad on this issue, though. We find that Schricker as an entity neither authorized nor created a second class of shares by

**[*11]** way of a formal corporate action. That means that we must hold that Schricker continued to maintain its S corporation status for the years at issue.

III. *Conclusion*

Schricker's income from 2014–16 flowed through to Maggard and Chang, and Schricker isn't subject to taxation as a C corporation. The couple must include in their income for these years Maggard's proportionate share of Schricker's income despite the disproportionate distributions made to LL and WJ at Maggard's expense. The parties settled other issues, so

*Decision will be entered under Rule 155.*